**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HUI ZHANG, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN,<br>                    Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Hui Zhang ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Acacia Communications, Inc., ("Acacia" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Acacia; and (c) review of other publicly available information concerning Acacia.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that acquired Acacia's securities between August 11, 2016 and July 13, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Acacia claims that its mission is to deliver high-speed coherent optical interconnect products that transform communications networks, relied upon by cloud infrastructure operators and content and communication service providers, through improvements in performance and capacity and a reduction in associated costs. The Company's products purportedly include low-power coherent digital signal processor application-specific integrated circuits, or DSP ASICs, and silicon photonic integrated circuits, or silicon PICs, which the Company claims it has integrated into families of optical interconnect modules with transmission speeds ranging from 100 to 400 Gbps for use in long-haul, metro and inter-data center markets.

3.     On October 27, 2016, ADVA Optical Networking, one of Acacia's largest customers, issued a press release announcing that it expected disappointing fourth quarter revenues of 125 million euros to 140 million euros, far below the 149 million euro previously estimated by analysts. On the same day, another one of Acacia's biggest customers, ZTE

---

[1] "Defendants" refers to Acacia Communications, Inc., Murugesan Shanmugaraj, and John F. Gavin, collectively.

Corporation, announced disappointing third quarter 2016 results

4.    On this news, the Company's stock price fell $13.87 per share, or 15.8%, to close at $73.66 per share on October 27, 2016, on unusually heavy trading volume. The Company's shares continued to decline over the course of the next six trading sessions, dropping $2.42 per share on October 28, 2016, $1.55 per share on October 31, 2016, $1.27 per share on November 1, 2016, $0.07 on November 2, 2016, $5.09 per share on November 3, 2016, and $0.37 on November 4, 2016, to close at $62.89 on November 4, 2016.  The total decline over the course of these six trading sessions was $10.77 per share, or 14.6%.

5.    On May 31, 2017, the Company disclosed that it identified a "quality issue" that it believed affected a portion of the Company's approximately 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers.  The Company further stated that it believed the root cause of the quality issue was a problem with a circuit board cleaning process.

6.    Then, on July 14, 2017, the Company issued a press release announcing its preliminary second quarter 2017 results.  Therein, the Company stated that its second quarter results were adversely affected by the quality issue identified on May 31.  The Company further explained that it experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for the Company's AC400 and CFP units.

7.    On this news, the Company's stock price fell $2.62 per share, or 6.3%, to close at $39.00 per share on July 14, 2017, on unusually heavy trading volume.

8.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was experiencing declining demand for its products from important customers; (2) that the Company's manufacturing quality control system was inadequate; (3) that, as a result, the Company's manufacturing process was causing certain of the Company's units to be unsaleable; and (4) that, as a result of the foregoing, Defendants' statements about Acacia's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff Hui Zhang, as set forth in the accompanying certification, incorporated by reference herein, purchased Acacia securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Acacia Communications, Inc. is incorporated in Delaware and its headquarters are in Maynard, Massachusetts.  Acacia's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "ACIA."

16.     Defendant Murugesan Shanmugaraj ("Shanmugaraj") was the Chief Executive

officer ("CEO") of Acacia at all relevant times.

17.     Defendant John F. Gavin ("Gavin") was the Chief Financial officer ("CFO") of Acacia at all relevant times.

18.     Defendants Shanmugaraj and Gavin (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Acacia's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Acacia claims that its mission is to deliver high-speed coherent optical interconnect products that transform communications networks, relied upon by cloud infrastructure operators and content and communication service providers, through improvements in performance and capacity and a reduction in associated costs.  The Company's products purportedly include low-power coherent digital signal processor application-specific integrated circuits, or DSP ASICs, and silicon photonic integrated circuits, or silicon PICs, which the Company claims it has integrated into families of optical interconnect modules with transmission speeds ranging from 100 to 400 Gbps for use in long-haul, metro and inter-data center markets.

**Materially False and Misleading**
**Statements Issued During the Class Period**

20.     The Class Period begins on August 11, 2016.  On that day, the Company issued a press release entitled "Acacia Communications Reports Second Quarter 2016 Results."  Therein, the Company, in relevant part, stated:

> "Our record second quarter results exceeded our expectations across the board and reflect the success of our disruptive technology in transforming cloud, content and communications networks. These results are a testament to our strategy and demonstrate our leadership position in the high-growth 100G plus optical networking market," said Raj Shanmugaraj, President and CEO of Acacia Communications,

> "We continue to see strong global demand for our products, driven by metro and inter-data center network infrastructure buildouts."

> "We are delighted to have completed our IPO during the second quarter and are excited about the many opportunities ahead of us," said John Gavin, CFO of Acacia Communications, "The IPO enabled us to strengthen Acacia Communications' balance sheet while providing substantial capacity to further grow the business."

> **Results for the Second Quarter of 2016**

> - Revenue of $116.2 million, increased 101% year-over-year
> - GAAP gross margin of 46.4% of revenue; non-GAAP gross margin of 47.0% of revenue
> - GAAP income from operations of $23.5 million; non-GAAP income from operations of $32.6 million
> - GAAP net income of $17.6 million; non-GAAP net income of $28.9 million
> - EBITDA of $22.0 million; adjusted EBITDA of $34.7 million
> - GAAP diluted EPS of $0.43; non-GAAP diluted EPS of $0.77

> **Outlook for the Third Quarter of 2016**

> The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially, as a result of, among other things, the important factors discussed at the end of this release. Acacia Communications disclaims any obligation to update these forward-looking statements.

> Acacia Communications' expectations for the third quarter of 2016 are:

> | Quarter Ending September 30, 2016 | | | | |
> |---|---|---|---|---|
> | Revenue (millions) | $ | 120.0 | to  $ | 128.0 |

| | | | | |
|---|---|---|---|---|
| Non-GAAP Net Income (millions) | $ | 26.0 | to $ | 31.0 |
| Non-GAAP Diluted Earnings Per Share | $ | 0.64 | to $ | 0.76 |

21.     On the same day, August 11, 2016, the Company filed its quarterly report on Form 10-Q for the 2016 second quarter.  The 10-Q was signed by Defendant Shanmugaraj, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 11, 2016.

22.     The Company also participated in an investor conference call on August 11, 2016, in which Defendant Shanmugaraj touted the unprecedented growth in the Company's customer base, stating in relevant part:

> The market opportunity we are targeting is large and growing. The growth in bandwidth demand has caused an increase in investments across long-haul, metro, and inter-data center networks with most of that investment focused on speeds of 100G and higher. With the growth of large data centers and content moving closer to the consumer, we are seeing strong demand for our products across metro and inter-data center networks.
>
> Geographically, we are seeing demand across all regions, while demand from China is particularly strong. Our customer base has grown from eight customers in 2011 to more than 25 customers in the first half of 2016. We have seen substantial increases in customer revenue in the past four years from our original eight customers. They have increased both the volume and the number of products they purchase from us, and we believe we will see similar increases from our newer customers going forward.
>
> Our growth is being driven by strong global demand from metro and inter-data center network build outs. We believe that the industry is in the early stages of a multi-year build out cycle of 100G, 200G and 400G technology. These build outs are happening in long-haul, including submarine and in metro and inter-data center networks.
>
> In the second quarter, we saw a step function increase in demand driven by deployments in all of our growth markets. We started to see this demand increase beginning late in the first quarter and continuing into the second quarter, which enabled us to achieve a revenue growth rate of 91% year-over-year in the first half of 2016. We expect similar growth to continue into the second half of 2016.

23.     On this news shares of Acacia climbed in value, gaining over 40% in one day, or $27.97 per share, to close at $95.67 per share on August 12, 2017.

24.     On October 7, 2016, the Company filed a prospectus with the SEC, for the

purpose of offering to the public 4,500,000 shares at $100 per share, of which the Company was selling 1,210,302 shares, and certain stockholders were selling 3,289,698 shares. Therein, the Company stated:

**Growing Demand for Bandwidth and Network Capacity**

Global Internet protocol, or IP, traffic is projected to nearly triple from 2.4 exabytes per day in 2015 to 6.4 exabytes per day in 2020, representing a 22% compound annual growth rate, or CAGR, according to Cisco's Visual Networking Index Complete Forecast Highlights Report, dated June 2016, or the VNI Report. This rapid growth in IP traffic is the result of several factors, including:

- **Increased data and video consumption.** Over the last decade, the proliferation of new technologies, applications, Web 2.0-based services and Internet-connected devices has led to increasing levels of Internet traffic and congestion and the need for greater bandwidth. Video traffic, in particular, is growing rapidly, and placing significant strains on network capacity. The VNI Report estimates that video traffic will represent 82% of all global IP traffic in 2020, reaching 158.9 exabytes per month, up from 51.0 exabytes per month in 2015.

- **Growth in mobile and 4G/LTE communications.** The increasing demand for data- and video-intensive content and applications on mobile devices is driving significant growth in mobile data and video traffic and has led to the proliferation of advanced wireless communication technologies, such as 4G/LTE, which depend on wired networks to function. According to Cisco's Visual Networking Index: Global Mobile Data Traffic Forecast Update, 2015-2020 White Paper, dated February 2016, global mobile data traffic grew 74% in 2015 from the prior year and is expected to increase nearly eight-fold from 2015 to 2020, a 53% compound annual growth rate.

- **Proliferation of cloud services.** Enterprises are increasingly adopting cloud services to reduce IT costs and enable more flexible operating models. Consumers are increasingly relying on cloud services to satisfy video, audio and photo storage and sharing needs. Together, these factors are driving increased Internet traffic as cloud services are accessed and used. Daily global cloud traffic is expected to quadruple from 5.8 exabytes in 2014 to 23.6 exabytes in 2019, according to the Cisco Global Cloud Index, dated October 2015. Forrester Research, in its report on Public Cloud Markets, released in September 2016, forecasts that the public cloud market will reach $236 billion by 2020, growing at a CAGR of 22% between 2015 and 2020.

- **Changing traffic patterns.** Content service providers and data center operators are increasingly building their own networks of connected data centers to handle increasing amounts of data. The architectures of these

connected data centers dramatically increase the amount of data being transmitted within these data center networks. For example, Facebook found that a single 1 kB data inquiry generated 930 kB of traffic within its private data center network as reported in Facebook's Data Center Network Architecture, abstract from the proceedings of the IEEE Optical Interconnects Conference, published in May 2013.

- ***Adoption of the "Internet of Things."*** Significant consumer, enterprise and governmental adoption of the "Internet of Things," which refers to the global network of Internet-connected devices embedded with electronics, software and sensors, is anticipated to strain network capacity further and increase demand for bandwidth. The VNI Report estimates that 26.3 billion devices and objects will be connected to the Internet by 2020, compared to 16.3 billion in 2015.

25. The above statements identified in ¶¶20-24 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was experiencing declining demand for its products from important customers; (2) that the Company's manufacturing quality control system was inadequate; and (3) that, as a result of the foregoing, Defendants' statements about Acacia's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

26. On October 27, 2016, ADVA Optical Networking, one of Acacia's largest customers, issued a press release announcing that it expected disappointing fourth quarter revenues of 125 million euros to 140 million euros, far below the 149 million euro previously estimated by analysts. On the same day, another one of Acacia's biggest customers, ZTE Corporation, announced disappointing third quarter 2016 results

27. On this news, the Company's stock price fell $13.87 per share, or 15.8%, to close at $73.66 per share on October 27, 2016, on unusually heavy trading volume. The Company's shares continued to decline over the course of the next six trading sessions, dropping $2.42 per share on October 28, 2016, $1.55 per share on October 31, 2016, $1.27 per share on November 1, 2016, $0.07 on November 2, 2016, $5.09 per share on November 3, 2016, and $0.37 on November 4, 2016, to close at $62.89 on November 4, 2016. The total decline over the course of these six trading sessions was $10.77 per share, or 14.6%.

28.    On February 23, 2017, the Company issued a press release entitled "Acacia Communications Reports Fourth Quarter and Full Year 2016 Results." Therein, the Company, in relevant part, stated:

"Our solid fourth quarter results were driven by continued strong global demand for our 100G and flex-400G products from the metro and DCI markets and the ramp of our newer customers, and we are very pleased to report that we added a hyper-scale cloud and content provider, who is a direct customer deploying our AC400 product, as a significant customer in the fourth quarter," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We are committed to our mission of delivering high-speed optical interconnects that transform cloud, content and communication networks. We are already seeing good traction with our latest "industry first" product, the CFP2-DCO module, and we believe that our current product offerings, roadmap products, and development pipeline, position us well to take advantage of future growth opportunities."

"Our fourth quarter results again exceeded our guidance for revenue and non-GAAP diluted EPS* and capped off a strong year at Acacia Communications. During the fourth quarter, we experienced year-over-year revenue growth of 108%, further diversified our revenue base, with sales to newer customers outside our original eight 2011 customers increasing to 35% of our total revenue from 14% in the first quarter of 2016," said John Gavin, Chief Financial Officer of Acacia Communications. "We believe our market strategy and business model are strong, and position us for further growth."

**Results for the Fourth Quarter of 2016**

- Revenue of $142.4 million, increased 108% year-over-year
- GAAP gross margin of 48.0%; non-GAAP gross margin* of 48.3%
- GAAP income from operations of $41.3 million; non-GAAP income from operations* of $46.0 million
- GAAP net income of $64.5 million; non-GAAP net income* of $39.0 million
- EBITDA* of $44.0 million; adjusted EBITDA* of $48.6 million
- GAAP diluted EPS of $1.55; non-GAAP diluted EPS* of $0.94

**Results for the Full Year 2016**

- Revenue of $478.4 million, increased 100% year-over-year
- GAAP gross margin of 46.2%; non-GAAP gross margin* of 46.5%
- GAAP income from operations of $117.6 million; non-GAAP income from operations* of $138.3 million
- GAAP net income of $131.6 million; non-GAAP net income* of $123.4 million
- EBITDA* of $123.3 million; adjusted EBITDA* of $147.4 million
- GAAP diluted EPS of $3.22; non-GAAP diluted EPS* of $3.18

29. On the same day, February 23, 2017, the Company filed its annual report on Form 10-K for the 2016 fiscal year. The 10-K was signed by Defendant Shanmugaraj, and reaffirmed the Company's statements about its financial results contained in the press release issued on February 23, 2017.

30. On May 9, 2017, the Company issued a press release entitled "Acacia Communications Reports First Quarter 2017 Results." Therein, the Company, in relevant part, stated:

> "We are pleased that our first quarter results came in stronger than we expected at the start of the quarter driven by demand for our CFP and flex-400G products around the world," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "During the quarter, we made good progress on ramping production of our CFP2-ACO and CFP2-DCO modules with our contract manufacturers and we continue to see strong customer interest for these products. We believe that our continued innovation with products like our CFP2-DCO will further advance our technology leadership position and contribute to our growth in the second half of 2017 and beyond."
>
> "We believe that our strong balance sheet, which shows a significant cash position and no debt, provides us with the financial flexibility to continue to invest in product development to further strengthen our competitive position and enable us to bring products to those markets that require a rapid pace of innovation, like the DCI market," said John Gavin, Chief Financial Officer of Acacia Communications. "For example, we recently announced our next generation Pico DSP ASIC which, when combined with our ball grid array PIC, will support transmission speeds of up to 1.2 Tbps with two carriers of 600 Gbps each. Pico will power our AC1200 module and is focused on DCI applications."
>
> **Results for the First Quarter of 2017**
>
> - Revenue of $114.7 million, increased 36% year-over-year
> - GAAP gross margin of 49.1%; non-GAAP gross margin* of 49.5%
> - GAAP income from operations of $29.9 million; non-GAAP income from operations* of $34.5 million
> - GAAP net income of $35.7 million; non-GAAP net income* of $32.0 million
> - EBITDA* of $32.7 million; adjusted EBITDA* of $37.4 million
> - GAAP diluted EPS of $0.86; non-GAAP diluted EPS* of $0.77
>
> **Outlook for the Second Quarter of 2017**
>
> The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially, as a result of, among

other things, the important factors discussed at the end of this press release. Acacia Communications disclaims any obligation to update these forward-looking statements.

Acacia Communications' guidance for its second quarter ending June 30, 2017 is:

**Quarter Ending June 30, 2017**

| | | | |
|---|---|---|---|
| Revenue (millions) | $ 85.0 | to | $ 95.0 |
| Non-GAAP Net Income* (millions) | $ 10.0 | to | $ 15.0 |
| Non-GAAP Diluted EPS* | $ 0.22 | to | $ 0.35 |

31.    On the same day, May 9, 2017, the Company filed its quarterly report on Form 10-Q for the 2017 first quarter.   The 10-Q was signed by Defendant Shanmugaraj, and reaffirmed the Company's statements about its financial results contained in the press release issued on May 9, 2017.

32.    The above statements identified in ¶¶28-31 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Company's manufacturing quality control system was inadequate; (2) that, as a result, the Company's manufacturing process was causing certain of the Company's units to be unsaleable; and (3) that, as a result of the foregoing, Defendants' statements about Acacia's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

33.    On May 31, 2017, the Company disclosed that it identified a "quality issue" that it believed affected a portion of the Company's approximately 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers.  The Company further stated that it believed the root cause of the quality issue was a problem with a circuit board cleaning process..  In greater part, the Company stated:

Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced that the Company has identified a quality issue that it currently believes affects a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers over an approximate four month period. The Company believes the root cause of this quality issue has been identified as a circuit board cleaning process that has since been eliminated, and manufacturing

at this contract manufacturer has resumed. The Company does not believe that products currently being shipped are affected by this quality issue. The Company is actively working with affected customers to remediate this issue. The Company is also working to estimate the cost of these remediation efforts and assess the impact of this issue on its near-term manufacturing capacity.

34.    The above statements identified in ¶33 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants failed to disclose: (1) that the manufacturing issues identified by the Company would cause supply constraints, since manufacturing capacity would be used to both build replacement units and to meet new demand from customers; and (2) that, as a result of the foregoing, Defendants' statements about Acacia's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

35.    On July 14, 2017, the Company issued a press release announcing its preliminary second quarter 2017 results.    Therein, the Company stated that its second quarter results were adversely affected by the quality issue identified on May 31.    The Company further explained that it experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for the Company's AC400 and CFP units.    In greater part, the Company stated:

> **MAYNARD, Mass. – July 14, 2017 —** Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced certain preliminary financial results for the quarter ended June 30, 2017 and provided preliminary guidance for its third quarter ending September 30, 2017.
>
> "Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for our AC400 and CFP units," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

"While we are disappointed with the impact that the quality issue had on second quarter results, looking ahead to the third quarter, we believe we are well positioned to meet customer demand for our products, which we believe continues to be driven by the strength of our product capabilities," said John Gavin, Chief Financial Officer of Acacia Communications. "We remain excited about Acacia's future growth opportunities, and believe that the new products we are currently ramping up will be contributors to our anticipated growth in the second half of 2017 over the first half of 2017."

**Preliminary Results for the Second Quarter of 2017**

- Revenue of $77.0 million to $79.0 million
- GAAP net (loss) of $(7.5) million to $(5.5) million
- Non-GAAP net income of $7.0 million to $8.5 million
- GAAP diluted (net loss) per share of $(0.19) to $(0.14)
- Non-GAAP diluted EPS of $0.17 to $0.20

36.    On this news, the Company's stock price fell $2.62 per share, or 6.3%, to close at $39.00 per share on July 14, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Acacia's securities between August 11, 2016 and July 13, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

38.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Acacia's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Acacia shares were traded publicly during the Class Period on the NASDAQ. As of July 28, 2017, Acacia had 39,228,125 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Acacia or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Acacia; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## **UNDISCLOSED ADVERSE FACTS**

43.     The market for Acacia's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Acacia's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Acacia's securities

relying upon the integrity of the market price of the Company's securities and market information relating to Acacia, and have been damaged thereby.

44.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Acacia's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Acacia's business, operations, and prospects as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Acacia's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

46.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.    During the Class Period, Plaintiff and the Class purchased Acacia's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

48.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acacia, their control over, and/or receipt and/or modification of Acacia's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Acacia, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE<br>(FRAUD-ON-THE-MARKET DOCTRINE)

49.    The market for Acacia's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Acacia's securities traded at artificially inflated prices during the Class Period.  On September 6, 2016, the Company's stock price closed at a Class Period high of $123.44 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Acacia's securities and market information relating to Acacia, and have been damaged thereby.

50.    During the Class Period, the artificial inflation of Acacia's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Acacia's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Acacia and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

51.    At all relevant times, the market for Acacia's securities was an efficient market for the following reasons, among others:

(a)    Acacia stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Acacia filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Acacia regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Acacia was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for Acacia's securities promptly digested current information regarding Acacia from all publicly available sources and reflected such information in Acacia's stock price. Under these circumstances, all purchasers of Acacia's securities during the Class Period suffered similar injury through their purchase of Acacia's securities at artificially inflated prices and a presumption of reliance applies.

53.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is

not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Acacia who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Acacia's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

57.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Acacia's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Acacia's financial well-being and prospects, as specified herein.

59.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Acacia's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Acacia and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

60.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

61.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Acacia's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Acacia's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Acacia's securities during the Class Period at artificially high prices and were damaged thereby.

63.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Acacia was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Acacia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

66.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.    Individual Defendants acted as controlling persons of Acacia within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69.    As set forth above, Acacia and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 16, 2017

**BLOCK & LEVITON LLP**

By: /s/ Jeffrey C. Block
Jeffrey C. Block (BBO No. 600747)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockesq.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

## SWORN CERTIFICATION OF PLAINTIFF

## ACACIA COMMUNICATIONS, INC. SECURITIES LITIGATION

I, Hui Zhang individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase Acacia Communications, Inc. the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Acacia Communications, Inc. during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

7/18/2017
_____
Date

DocuSigned by:
*Hui Zhang*
A01CFD1462BB43B...
_____
Hui Zhang

341986.1

**Hui Zhang's Transactions in**
**Acacia Communications, Inc. (ACIA)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 09/26/2016 | Bought | 100 | $107.9800 |
| 09/26/2016 | Bought | 100 | $107.9600 |
| 09/26/2016 | Bought | 300 | $107.9500 |
| 09/26/2016 | Bought | 200 | $107.9400 |
| 09/26/2016 | Bought | 153 | $107.9000 |
| 09/26/2016 | Bought | 400 | $107.8600 |
| 09/26/2016 | Bought | 8,947 | $108.0000 |
| 09/28/2016 | Bought | 38 | $103.0835 |
| 11/22/2016 | Sold | -121 | $74.0000 |